AO 106 (Rev. 04/10) Application for a Search Warrant

EC

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Information, including the content of communications, )
associated with the Facebook account assigned the )
Facebook User ID 100090841337451 )
that is stored at premises controlled by Meta Platforms, Inc. )

Case No.   2:23-mj-681

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

### SEE ATTACHMENT A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2251 | Production of child pornography |
| 18 U.S.C. 2252 and 2252A | Possession, distribution, and/or receipt of child pornography |
| 18 U.S.C. 2242(b) | Coercion and Enticement of a Minor |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**SA Josh Saltar, FBI**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Dec. 7, 2023          _____

City and state: Columbus, Ohio          Kimberly A. Jolson
          United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT**
**EASTERN DIVISION OF OHIO**

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | **No.** 2:23-mj-681 |
| | ) | |
| **Information, including the content of communications,** | ) | **Magistrate Judge** |
| **Associated with the Facebook account assigned the** | ) | |
| **Facebook User ID 100090841337451, that is stored at** | ) | |
| **Premises controlled by Meta Platforms, Inc.** | ) | **UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Josh Saltar (Your Affiant), a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state:

## I.    EDUCATION TRAINING AND EXPERIENCE

1.    I am a Special Agent (SA) with the FBI and have been since October 2014. I am currently assigned to the Child Exploitation and Human Trafficking Task Force, Cincinnati Division, Columbus Resident Agency. I am primarily responsible for investigating internet crimes against children, including child pornography offenses and the online exploitation of children.

2.    During my career as a SA, I have participated in various investigations involving computer-related offenses and have executed numerous search warrants, including those involving searches and seizures of computers, digital media, software, and electronically stored information. I have worked with multiple international law enforcement agencies around the world, focusing on cyber-terrorism and terrorist financing through computer intrusions. I have also assisted on various cases and violations, ranging from violent crimes against children and white collar to healthcare fraud, counterintelligence, and counterterrorism. As part of my duties as a Special Agent, I investigate criminal violations relating to child exploitation and child pornography violations, including the illegal production, distribution, transmission, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A. I have reviewed numerous examples of child

pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media.

3. Prior to joining the FBI, I spent four years working as a civilian Intelligence Specialist for the U.S. Air Force at the National Air and Space Intelligence Center located at the Wright-Patterson Air Force Base, under both the cyber and counterspace squadrons, performing classified intel and reverse engineering duties. During my employment, I have received numerous forensic trainings with the both the Department of Defense and Department of Justice, as well as from private sector security conferences. I have received multiple certifications in Windows, mobile, and memory forensics, as well as incident response and penetration testing, and am certified by the Department of Justice as a Digital Extraction Technician. I received my B.A. from Anderson University in computer science, with a focus on programming, artificial intelligence, and machine learning.

4. As a SA with the FBI, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

## II.   **PURPOSE OF THE AFFIDAVIT**

5. I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user accounts/IDs that is stored at premises owned, maintained, controlled, or operated by Facebook via Meta Platforms, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in **Attachment A**. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, including the content of communications, pertaining to the Facebook account Terry King, which has an associated Facebook User ID of 100090841337451 (herein after identified as the **SUBJECT ACCOUNT**).

6. The **SUBJECT ACCOUNT** to be searched is more particularly described in **Attachment A**, for the items specified in **Attachment B**, which items constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. §§ 2251, 2252, 2252A, and 2422(b) – advertising/solicitation for/or, and distribution and receipt of visual depictions of minors engaged in sexually explicit conduct (hereinafter "child pornography"), distribution,

transmission, receipt, and/or possession of child pornography, as well as and the coercion or enticement of a minor(s). I am requesting authority to seize and examine the **SUBJECT ACCOUNT**, for items specified in **Attachment B**, and to seize all items listed in **Attachment B** as evidence, fruits, and instrumentalities of the above violations.

### III.   APPLICABLE STATUTES AND DEFINITIONS

7.   Title 18 United States Code, Section 2251(a) makes it a federal crime for any person to employ, use, persuade, induce, entice, or coerce any minor to engage in, or have a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, if such person knows or has reason to know that either the visual depiction will be transported or transmitted via a facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, or that the visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce, or if the visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce. Subsection (e) of this provision further prohibits conspiracies or attempts to engage in such acts.

8.   Title 18 United States Code, Section 2251(d)(1)(A) makes it a federal crime for any person to make, print, publish, or cause to be made, printed or published, any notice or advertisement that seeks or offers to receive, exchange, buy, produce, display, distribute or reproduce, any visual depiction involving the use of a minor engaging in sexually explicit conduct, if such person knows or has reason to know that either the notice or advertisement will be transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mail; or that the notice or advertisement actually was transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mail.

9.   Title 18, United States Code, Section 2252, makes it a federal crime for any person to knowingly transport, receive, distribute, possess or access with intent to view any visual depiction of a minor engaging in sexually explicit conduct, if such receipt, distribution or

possession utilized a means or facility of interstate commerce, or if such visual depiction has been mailed, shipped or transported in or affecting interstate or foreign commerce. This section also prohibits reproduction for distribution of any visual depiction of a minor engaging in sexually explicit conduct, if such reproduction utilizes any means or facility of interstate or foreign commerce or is in or affecting interstate commerce.

10. Title 18, United States Code, Section 2252A, makes it a federal crime for any person to knowingly transport, receive or distribute any child pornography using any means or facility of interstate commerce, or any child pornography that has been mailed, or any child pornography that has shipped or transported in or affecting interstate or foreign commerce by any means, including by computer. This section also makes it a federal crime to possess or access with intent to view any material that contains an image of child pornography that has been mailed, shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate commerce by any means, including by computer.

11. Title 18, United States Code, Section 2422(b), makes it a federal crime for any person to knowingly use a means of interstate commerce to persuade, induce, entice, or coerce or attempt to persuade, induce, entice or coerce, any individual who has not attained the age of 18 years, to engage in any sexual activity for which any person may be charged with a crime. Production of child pornography as defined in 18 U.S.C. § 2251(a) is included in the definition of sexual activity for which any person may be charged with a crime.

12. As it is used in 18 U.S.C. §§ 2251 and 2252, the term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2)(A) as actual or simulated: sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person.

13. As it is used in 18 U.S.C. § 2252A(a)(2), the term "child pornography"1 is defined in 18 U.S.C. § 2256(8) as: any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where: (A) the

---

[1] The term child pornography is used throughout this affidavit. All references to this term in this affidavit and all Attachments hereto include both visual depictions of minors engaged in sexually explicit conduct as referenced in 18 U.S.C. § 2252 and child pornography as defined in 18 U.S.C. § 2256(8).

production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

14. The term "sexually explicit conduct" has the same meaning in § 2252A as in § 2252, except that for the definition of child pornography contained in § 2256(8)(B), "sexually explicit conduct" also has the meaning contained in § 2256(2)(B): (a) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; (b) graphic or lascivious simulated (i) bestiality, (ii) masturbation, or (iii) sadistic or masochistic abuse; or (c) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.

15. The term "minor", as used herein, is defined pursuant to Title 18, United States Code, Section 2256(1) as "any person under the age of eighteen years."

16. The term "graphic," as used in the definition of sexually explicit conduct contained in 18 U.S.C. § 2256(2)(B), is defined pursuant to 18 U.S.C. § 2256(10) to mean "that a viewer can observe any part of the genitals or pubic area of any depicted person or animal during any part of the time that the sexually explicit conduct is being depicted."

17. The term "visual depiction," as used herein, is defined pursuant to T18 U.S.C. § 2256(5) to "include undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image."

18. The term "computer"2 is defined in 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

19. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form

---

2 The term "computer" is used throughout this affidavit to refer not only to traditional laptop and desktop computers, but also to internet-capable devices such as cellular phones and tablets. Where the capabilities of these devices differ from that of a traditional computer, they are discussed separately and distinctly.

(including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

20. "Cellular telephone" or "cell phone" means a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may include geographic information indicating where the cell phone was at particular times.

21. Internet Service Providers" (ISPs), used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

22. "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

23. As it is used throughout this affidavit and all attachments hereto, the term "storage media" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## IV.    BACKGROUND REGARDING SOCIAL MEDIA AND FACEBOOK

24. Through my training and experience, I have learned that Facebook, via Meta Platform Inc., (hereinafter referred to as "Facebook") owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

26. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not

Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and

although Facebook does not record the calls themselves, it does keep records of the date of each call.

31. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

33. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

34. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

36. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ill or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ill and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

38. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated

with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

39. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geolocation into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook

account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

40. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## V.   **INVESTIGATION AND PROBABLE CAUSE**

41. On or about the early morning of December 6, 2023, officers from the Columbus Division of Police (CPD) executed a traffic stop of Terry KING who was the driver and sole occupant of the vehicle. According to the CPD report, the law enforcement ran the license plate of the vehicle KING was driving and learned it was registered to KING who had a canceled operator's license.  The name check of KING also revealed he was a registered sex offender out of Hamilton, Ohio. When asked why he was in the Franklin County area, KING initially informed law enforcement that he was lost and was looking for a Holiday Inn Express.

42. During the traffic stop, KING changed his story as to why he was in the area multiple times. KING eventually informed the officers that he was supposed to meet a woman whom he had sent $80 too but that she had stopped returning his calls. KING then went on to tell the officers that he had given the money to this woman so she could get gas to come meet him but that the woman had later messaged him a story about getting pulled over in Jeffersonville on her way to meet him.  KING further indicated this woman told him that the police impounded her vehicle, so she wasn't able to meet him.

43. At that point, KING confirmed he had the messages in his phone pertaining to the story he had just told them. When the officers asked KING if they could view the messages to confirm, he stated "yes". The officers then asked a second time if they could go through KING's phone to see the messages with this woman to which KING responded that they could. KING opened his phone for law enforcement and closed out the conversation that was open on the phone. KING then opened up the Facebook Messenger application,

selected a different conversation, scrolled partway through and then passed the phone to the officers.

44. The officers observed the messages in the Facebook Messenger application and saw a message thread between KING and a female, herein after identified as A.L., in which KING had asked if he could meet A.L. A.L. then informed KING that she was at a residence with the minor daughters of her aunt, noting their ages as six and nine, and KING then inquired if he could have sex with the 9-year-old that was there. A.L. responded to the question with "yes".

45. After observing that conversation, the officers contacted CPD Sexual Assault detectives. At that point, in order to further investigation, law enforcement asked KING if he would voluntarily talk with detectives at CPD headquarters. KING agreed and was transported by the officers to meet with detectives at CPD headquarters.

46. Once KING arrived at CPD headquarters, CPD detectives read KING his Miranda Rights, which KING stated he understood, agreed to answer questions, and signed the Miranda form. KING was also informed he was free to leave at any time and that he was not in custody.

47. KING informed detectives that he had been in a Facebook Messenger conversation with another woman, herein after referred to as J.H. J.H. had initially agreed to meet KING in Hamilton, Ohio but claimed she ran out of gas and requested KING send her money. After KING sent money, J.H then claimed her car was being impounded and could not meet KING. J.H. then asked KING to meet him at the location of 208 Ludlow Street in Columbus, Ohio. When KING drove to Columbus and informed J.H. that he was at that address, J.H. did not respond. KING then decided to look for a hotel since he did not have a place to stay in Columbus, Ohio.

48. KING went on to say that after the meeting with J.H. did not happen, he began to message A.L., which he had been messaging around the same time as J.H. KING believed A.L. lived in Pennsylvania as they had discussed him coming to Pennsylvania so that they could have sex. According to KING, A.L. had told KING that she would need money from him because her aunt and aunt's two children were with A.L. at the time and that they would need a place to stay so that A.L. and KING would not be disturbed.

49. During the interview with detectives, KING gave consent to allow detectives to document the previously mentioned conversation with A.L. The following was an excerpt from the conversation between KING and A.L.:

| | |
|---|---|
| A.L.: | Do you wish to come and stay here |
| **KING:** | **I want a serious relationship as well** |
| **KING:** | **Yes** |
| **KING:** | **If you can promise me a lifelong serious relationship I will make sweet passionate love to you when I get there** |
| A.L.: | Okay I promise you babe but if you want to come you will have to please send me some money so you can stay for the night just because of my aunt kids I don't want any disturbance for us |
| **KING:** | **Give me the address** |
| **KING:** | **How much?** |
| A.L.: | I need 50 right now |
| **KING:** | **Does she have a daughter?** |
| A.L.: | Yes she has |
| **KING:** | **How old?** |
| A.L.: | 6 and 9 |
| A.L.: | Okay can you send it through cashapp |
| **KING:** | **Great age to start learning about how it feels with a man** |
| **KING:** | **Let me get ahold of my best friend to try to borrow it** |
| A.L.: | Okay should I send my tag now |
| A.L.: | So I can start preparing |
| **KING:** | **I will always make sure you are completely satisfied first if you let inside them** |
| A.L.: | Okay babe just promise you won't disappoint me and you won't break my heart |
| **KING:** | **Go ahead so I can send it IF my best friend gives it to me** |
| **KING:** | **I promise** |
| A.L.: | Should I send the tag or how can you send it to me |
| **KING:** | **So are you going to let me do it with them also tonight?** |
| A.L.: | We will do it together hun |
| **KING:** | **Go ahead so I can send it IF my best friend gives it to me** |
| A.L.: | Just both of us |
| **KING:** | **I want them too, are you ok with that after you and I do it?** |
| **KING:** | **Can I see more pictures of you and them?** |

A.L. then distributed three images of a blonde adult female to KING. The following conversation then ensued[3]:

| | |
|---|---|
| A.L.: | Try to talk to your friend now |
| **KING:** | **I'm extremely serious about you and them** |
| **KING:** | **So beautiful and sexy** |

---

[3] Despite KING's request for photographs of the minor children, A.L. did not distribute him any images of any minors.

| | |
|---|---|
| **KING:** | **I just sent him a message** |
| A.L.: | $elissacarey9721 |
| **KING:** | **You going to let me with you first then the 9 year old girl?** |
| **KING:** | **Be honest** |
| A.L.: | Yes I'm honest baby |
| **KING:** | **Will you let me?** |
| **KING:** | **With the 9 year old also?** |

50. After the interview with CPD detectives, law enforcement transported KING back to his vehicle. KING's phone remained in the custody of CPD detectives. Your affiant was later informed of the investigation that same day.

51. Open-source research was conducted by law enforcement on December 6, 2023 and a Facebook account was identified matching the same as the one documented by CPD detectives. The account was identified with the Facebook name as Terry King and Facebook ID as 100090841337451 (**SUBJECT ACCOUNT**). A preservation letter was served to Facebook for the **SUBJECT ACCOUNT** that same date.

52. A criminal history check of KING and confirmed that on March 8, 2004, KING was sentenced to five years community control after being found guilty in Butler County Court of Common Pleas of Attempted Unlawful Sexual Conduct with a Minor in violation of ORC 2923.02(A) and 2907.04, a felony in the fourth degree, in addition to Importuning, in violation of ORC 2907.07(E)(2), a felony in the fifth degree. Your affiant also learned that KING violated his community control by possessing a computer and cellular phone capable of accessing the internet in addition to engaging in online chat conversations in private chat rooms via Yahoo! in violation of his terms and conditions. He was sentenced on those violations in Butler County on July 10, 2007 to 171 months and 11 months imprisonment respectively to be served concurrent to each other.

53. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, are located on/in the **SUBJECT ACCOUNT**. Therefore, I respectfully request that this Court issue search warrants for the device described in **Attachment A,** authorizing the seizure and search of the items described in **Attachment B**.

## VI. COMMON CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

54. Based on my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in communicating about and engaging in sexual abuse of children

   a. Those who communicate about and engage in sexual abuse of children and exchange or collect child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature and communications about such activity.

   b. Those who communicate about and engage in sexual abuse of children and trade or collect child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media, including digital files. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

   c. Those who communicate about and engage in sexual abuse of children and trade or collect child pornography sometimes maintain any "hard copies" of child pornographic material that may exist that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These child pornography collections and communications are often maintained for several years and are kept close by, usually at the collector's residence. In some recent cases, however, some people who have a sexual interest in children have been found to download, view, then delete child pornography on a cyclical and repetitive basis, and to regularly delete any communications about the sexual abuse of children rather than storing such evidence on their computers or

digital devices. Traces of such activity can often be found on such people's computers or digital devices, for months or even years after any downloaded files have been deleted.

d. Those who communicate about and engage in sexual abuse of children and trade or collect child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

e. When images and videos of child pornography or communications about sexual abuse of children are stored on computers and related digital media, forensic evidence of the downloading, saving, and storage of such evidence may remain on the computers or digital media for months or even years even after such images and videos have been deleted from the computers or digital media.

36. Based upon the conduct of individuals involved in seeking/soliciting, receiving, distributing, and/or collecting child pornography set forth in the above paragraphs, and the facts learned during the investigation in this case, namely, that KING believed to be talking to an adult female with access to a six and nine year old minor females, was requesting images of the children, and was requesting to perform sexual acts on the 9-year-old child, whom KING mentioned the child's age multiple times in conjunction with KING's status as a registered sex offender and prior convictions related to minor children. Therefore, Your Affiant has reason to believe that KING has a sexual interest in minors and has viewed or sought out visual depictions of minors engaged in sexually explicit conduct utilizing an internet-capable device. Your affiant therefore submits that there is probable cause to believe the evidence of the offenses of 18 U.S.C. §§ 2251, 2252, 2252A, and 2422(b) – advertising/solicitation for/or, and distribution and receipt of visual depictions of minors engaged in sexually explicit conduct (hereinafter "child pornography"), distribution, transmission, receipt, and/or possession of child pornography, as well as the coercion or enticement of a minor(s) will be located in the **SUBJECT ACCOUNT**.

**VII.**     **CONCLUSION**

37.  Based on the aforementioned factual information, your affiant submits there is probable cause to believe that violations of 18 U.S.C. §§ 2251, 2252, 2252A, and 2422(b) – advertising/solicitation for/or, and distribution and receipt of visual depictions of minors engaged in sexually explicit conduct (hereinafter "child pornography"), distribution, transmission, receipt, and/or possession of child pornography, as well as and the coercion or enticement of a minor(s),  have been committed, and evidence of those violations is located on the device described in **Attachment A**.  Your affiant respectfully requests that the Court issue a search warrant authorizing the search and seizure of the device described in **Attachment A**.

_____

Josh Saltar
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 7th day of December, 2023.

_____
Kimberly A. Jolson
United States Magistrate Judge

**ATTACHMENT A**
**DESCRIPTION OF PLACE TO BE SEARCHED**

This warrant applies to information, including the content of communications, associated with the following Facebook accounts:

- Facebook account Terry King, which has an associated Facebook User ID of 100090841337451;


that is stored at premises owned, maintained, controlled, or operated by Meta Platform, Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**
**LIST OF ITEMS TO BE SEIZED**

**I.     Information to be disclosed by Facebook:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook via Meta Platform, Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government, for the time period of November to present, for each user ID listed in **Attachment A**:

(a) All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event po stings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware

model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)  All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)  All "check ins" and other location information;

(h)  All IP logs, including all records of the IP addresses that logged into the account;

(i)  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)  All information about the Facebook pages that the account is or was a "fan" of;

(k)  All past and present lists of friends created by the account;

(l)  All records of Facebook searches performed by the account;

(m) All information about the user's access and use of Facebook Marketplace;

(n)  The types of service utilized by the user;

(o)  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 10 days of receipt of this warrant.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 2251, 2252, 2252A, and 2422(b) – advertising/solicitation for/or, and distribution and receipt of visual depictions of minors engaged

in sexually explicit conduct (hereinafter "child pornography"), distribution, transmission, receipt, and/or possession of child pornography, as well as and the coercion or enticement of a minor(s), involving the accounts of the user(s) with Facebook ID identified on Attachment A, information pertaining to the following matters:

      (a) Any and all communications related the production, receipt, distribution or possession of child pornography;

      (b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

      (c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

      (d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.